BWB:KDE
F.#2014F10855

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA

- against -

CHRISTOPHER SCOTT,
CHRISTOPHER SCOTT, JR.,
   also known as "C.J. Scott" and
NIMBOKO MILLER,

    Defendants.

------------------------------X

TO BE FILED UNDER SEAL

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANTS

(18 U.S.C. §§ 1349 and 3551 et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

    JOSEPH DELLA PENNA, being duly sworn, deposes and states that he is a Special Agent with the Federal Housing Finance Agency, Office of the Inspector General, duly appointed according to law and acting as such.

    Upon information and belief, in or about and between 2006 and November 2008, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants CHRISTOPHER SCOTT, CHRISTOPHER SCOTT, JR., also known as "C.J. Scott" and NIMBOKO MILLER, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to commit bank fraud, contrary to Title 18, United States Code, Section 1344.

    (Title 18, United States Code, Section 1349)

1

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I am a Special Agent with the Federal Housing Finance Agency, Office of Inspector General ("FHFA-OIG"). I have been a Special Agent with FHFA-OIG for the past 3 years. Prior to working at FHFA-OIG, I was a Special Agent with the United States Department of Labor, Office of Labor Racketeering and Fraud Investigations for 11 years.

2. I am familiar with the facts and circumstances set forth below from my personal participation in the investigation, my review of documents, my training and experience, and conversations with other law enforcement agents and witnesses concerning the investigation. Where I report statements made by others, these statements are reported in substance and in part unless otherwise indicated.

## THE SCHEME TO DEFRAUD

### I. Orchestrating the Scheme

3. In or about and between 2006 and November 2008, the defendants CHRISTOPHER SCOTT, CHRISTOPHER SCOTT, JR. and NIMBOKO MILLER and two co-conspirators ("CC-1" and "CC-2") orchestrated a scheme to defraud National City Bank[2] and Wells Fargo Bank N.A. ("Wells Fargo")—both financial institutions insured by the Federal Deposit Insurance Corporation ("FDIC")—by submitting false mortgage loan applications by which CC-1 and CC-2 purchased three properties in Far Rockaway, New

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

[2] National City Bank was later purchased by PNC Financial Services Group, Inc. ("PNC").

York. In actuality, neither CC-1 nor CC-2 ever intended to be the true beneficial owner of the properties and expected that the defendants SCOTT, SCOTT, JR., and MILLER would operate the properties and eventually purchase them back from CC-1 and CC-2. To procure these loans, SCOTT, SCOTT, JR. and CC-1 (as to two properties), and MILLER and CC-2 (as to the third), agreed to include false information in the mortgage applications such that the banks would disburse loan proceeds to otherwise unqualified buyers. Although the extent of the harm caused by this scheme is presently unknown, as a result of the conspirators' fraud, these banks and/or the government-sponsored enterprise ("GSE") that purchased two of the mortgage loans from the banks expect to realize over $245,000 in losses because the defendants and/or their co-conspirators failed to repay the fraudulently procured mortgage loans.

A. <u>305 and 307 Beach</u>

4. In approximately 2006, CC-1 retired after having worked for the New York City Department of Corrections. According to CC-1, after he/she retired, one of CC-1's former co-workers introduced CC-1 to the defendant CHRISTOPHER SCOTT. SCOTT approached CC-1 about purchasing two properties in Far Rockaway, New York: 305 Beach 89th Street ("305 Beach") and 307 Beach 88th Street ("307 Beach"). SCOTT requested that CC-1 purchase the properties on SCOTT's behalf because SCOTT had poor credit.

5. The defendant CHRISTOPHER SCOTT told CC-1 that if CC-1 would purchase the properties on SCOTT's behalf, approximately six months later, SCOTT would buy the properties back from CC-1 and that they would be transferred into the name of the defendant CHRISTOPHER SCOTT, JR. or a business owned by SCOTT, JR. In exchange

3

for CC-1 agreeing to serve as the nominal purchaser of 305 Beach and 307 Beach, SCOTT agreed to pay CC-1 approximately $10,000.

6. CC-1 has reported that in approximately 2006 until approximately 2008, CC-1 met with the defendant CHRISTOPHER SCOTT approximately four or five times to discuss the fraudulent scheme. During one of these meetings, CC-1 asked SCOTT how CC-1 would be able to purchase these properties because he/she had retired and was not employed. SCOTT instructed CC-1 that if anyone asked CC-1 about CC-1's employment status, CC-1 should state that he/she worked for a particular real estate company ("Real Estate Company A").

7. In connection with another preparatory meeting, which occurred at CC-1's house, the defendant CHRISTOPHER SCOTT introduced CC-1 to his son, the defendant CHRISTOPHER SCOTT, JR. During this introduction, SCOTT again explained that, after CC-1 purchased 305 Beach and 307 Beach, SCOTT, JR. (or one of his businesses) would take title to the two properties.

B. <u>309 Beach</u>

8. In or about 2008, CC-2 was employed at the Metropolitan Transit Authority ("MTA"). In or about the early part of 2008, CC-2 was approached by a co-worker ("CC-3"), who asked CC-2 if CC-2 was interested in making extra money. CC-2 replied in the affirmative. CC-3 then stated that CC-2 could earn extra money if he/she let his/her information be used in a real estate transaction. When CC-2 agreed, CC-3 introduced CC-2 to the defendant NIMBOKO MILLER, who CC-3 explained also worked for the MTA. CC-3 told CC-2 that for CC-2's role in the scheme, CC-2 would earn an amount between $5,000 and $10,000.

4

9. A few weeks after CC-3 approached CC-2, CC-2 met with the defendant NIMBOKO MILLER inside MILLER's car to discuss the scheme. According to CC-2, MILLER stated that he intended CC-2 to serve as the nominal purchaser for a property on Long Island ("Long Island Property"). MILLER also stated that CC-2 would have to provide certain personal information, including, but not limited to, CC-2's driver's license, social security card, and pay stubs. MILLER stated that after CC-2 purchased the property, MILLER would buy it back from CC-2. For serving as the nominal purchaser for this property, MILLER agreed to pay CC-2 an amount between $5,000 and $10,000.

10. According to CC-2, a few weeks after this meeting, the defendant NIMBOKO MILLER picked CC-2 up in his car. CC-2 brought the requested paperwork, and MILLER drove the two to an office complex on Long Island. At this office complex, MILLER and another individual made copies of CC-2's paperwork. MILLER then drove CC-2 back to his/her home.

11. In connection with this meeting, CC-2 told the defendant NIMBOKO MILLER that he/she had previously declared bankruptcy and expressed concern that he/she therefore might not be able to procure financing for the Long Island Property. In response, MILLER told CC-2 not to worry.

12. Approximately one to two weeks after CC-2 made copies of his/her paperwork, the defendant NIMBOKO MILLER called CC-2 and stated that the deal for the Long Island Property had fallen through. A few weeks later, MILLER again called CC-2 and told CC-2 that he had located another property for which CC-2 could serve as the nominal purchaser: 309 Beach 88th Street, Far Rockaway, New York ("309 Beach"). As was the case for the Long Island Property, CC-2 never intended to be the true beneficial

5

owner of 309 Beach and expected that MILLER would maintain the property and eventually purchase the property back from CC-2.

II. False Loan Applications

13. To ensure that the banks authorized lending money to CC-1 and CC-2 to purchase 305, 307 and 309 Beach, the defendants CHRISTOPHER SCOTT, CHRISTOPHER SCOTT, JR. and NIMBOKO MILLER caused CC-1 and CC-2 to submit mortgage loan applications containing numerous false statements, including their employment history, their income, and the amount of money in their bank accounts. Some of these applications were supported by forged bank account statements. And in at least one instance, one of the defendants falsely told the bank that a co-conspirator was employed by his company.

A. 307 Beach

14. In approximately May 2008, the defendant CHRISTOPHER SCOTT presented CC-1 with, among other things, a Uniform Residential Loan Application ("URLA/1003"[3]) and supporting documentation for 307 Beach. Based on my training and experience, I know that a URLA/1003 is a standardized form that provides a loan originator with information necessary to determine a borrower's qualifications for a mortgage and to continue the process of securing financing. According to CC-1, when SCOTT presented CC-1 with the URLA/1003 and supporting materials, the paperwork had already been filled out with the relevant information. SCOTT instructed CC-1 to sign the various paperwork, including the URLA/1003, which CC-1 did.

---

[3] Based on my training and experience, in the real estate industry, a URLA is also known as a "Fannie Mae Form 1003" or a "Freddie Mac Form 65," or simply a "Form 1003."

15. I have reviewed the URLA/1003 for 307 Beach, which requested $413,250 in loan proceeds to help purchase the property, and determined that it contained multiple false statements. For example, the URLA/1003 stated that CC-1 was currently employed as a "Property Manager" for Real Estate Company A. The URLA/1003 stated that CC-1 had been employed at Real Estate Company A for over five years and had been in that line of work for approximately eight years. In actuality, CC-1 was then retired, had never worked for Real Estate Company A and had never worked in the real estate industry.

16. In addition, the URLA/1003 stated that CC-1 had bank accounts at "Citibank" with a balance of $75,028. In support, the URLA/1003 attached a forged statement from Citibank N.A. ("Citibank") for the period of March 10, 2008 to April 12, 2008 for a checking account and a savings account with a purported total closing balance of $78,028.47. I have reviewed legitimate bank statements produced by Citibank, which reveal that, in actuality, between March and June 2008, CC-1 never had more than approximately $3,400 in CC-1's accounts at Citibank.

B. <u>305 Beach</u>

17. In approximately June 2008, the defendant CHRISTOPHER SCOTT presented CC-1 with, among other things, a URLA/1003 and supporting documentation for 305 Beach. According to CC-1, when SCOTT presented CC-1 with the URLA/1003 and supporting materials, the paperwork had already been filled out with the relevant information. SCOTT instructed CC-1 to sign the various paperwork, including the URLA/1003, which CC-1 did.

18. I have reviewed the URLA/1003 for 305 Beach, which requested $446,500 in loan proceeds to help purchase the property, and determined that, like the

URLA/1003 for 307 Beach, the URLA/1003 for 305 Beach contained many of the same false statements. For example, the URLA/1003 stated that CC-1 was currently employed as a "Property Manager" for Real Estate Company A. The URLA/1003 stated that CC-1 had been employed at Real Estate Company A for five years and had been in that line of work for eight years. In actuality, CC-1 was then retired, had never worked for Real Estate Company A and had never worked in the real estate industry.

19. In addition, the URLA/1003 for 305 Beach stated that CC-1 had bank accounts at "Citibank" with a balance of $78,028.47. As described above, based on my review of legitimate bank statements produced by Citibank, in actuality, between March and June 2008, CC-1 never had more than approximately $3,400 in CC-1's accounts at Citibank.

C. 309 Beach

20. In approximately June 2008, the defendant NIMBOKO MILLER told CC-2 to meet him in order to sign paperwork relating to 309 Beach. CC-2 drove to meet MILLER at an agreed upon location on Long Island. At this location, MILLER picked up CC-2 and drove him/her to another office complex on Long Island.

21. Upon arriving at this office complex, CC-2 signed various paperwork in connection with 309 Beach. According to CC-2, all of the paperwork he/she signed had previously been completed. Approximately five or six people, including MILLER, attended this meeting. Although CC-2 did not realize it at the time, this was the closing for 309 Beach.

22. CC-2 signed, among other things, a URLA/1003 for 309 Beach dated June 13, 2008. I have reviewed the URLA/1003 for 309 Beach, which requested $413,250 in loan proceeds to help purchase the property, and determined that it contained multiple false

statements. For instance, the URLA/1003 states that in addition to working for the MTA, since May 2005 CC-2 had worked as a "Sales Supervisor" for a company identified as "Hands On Builders and Ren," when in actuality, CC-2 had never worked for or even heard of this company.

23. Records from the New York State Department of State, Division of Corporations show that on approximately February 25, 2000, the defendant CHRISTOPHER SCOTT incorporated a company called "Hands on Builders and Renovators, Inc." ("Hands On"). I have also reviewed the Wells Fargo loan file for 309 Beach, which indicates that on approximately June 11, 2008, a Wells Fargo employee spoke with SCOTT who stated that CC-2 had been a "Sales Supervisor" at "Hands on Builders and Ren" since approximately May 2005.

24. In addition, the URLA/1003 for 309 Beach states that CC-2 was then earning $8,603 per month. In actuality, CC-2 was then employed as a train conductor for the MTA and earned far less income.

25. Furthermore, the URLA/1003 states that CC-2 had a bank account at "Capital One" with a balance of $59,150. In support, the Wells Fargo loan file contains a forged Capital One account statement indicating that as of April 14, 2008, CC-2 had an account balance of $59,150.51. I have reviewed legitimate bank records produced by Capital One N.A., which reveal that in actuality, although CC-2 did have an account at Capital One between April and June 2008, at that time it had a balance of approximately $9.15.

III. The Closings, Disbursement of Loan Proceeds, and Post-Closing

26. In order to procure the loans that funded CC-1's and CC-2's purchase of 305, 307 and 309 Beach, the defendants CHRISTOPHER SCOTT, CHRISTOPHER

9

SCOTT, JR. and NIMBOKO MILLER presented the false mortgage loan applications to the respective banks, which are FDIC-insured institutions. The banks, relying on the veracity of these applications, then disbursed the loan proceeds and CC-1 and CC-2 took title to the properties. Although CC-1 and CC-2 were the nominal purchasers of the properties, SCOTT and SCOTT JR. (as to 305 and 307 Beach) and MILLER (as to 309 Beach) were the true beneficial owners and made certain payments on the mortgage loans in furtherance of the illicit scheme.

A. 305 and 307 Beach

27. Upon signing the URLA/1003 and other paperwork for 305 and 307 Beach, CC-1 closed on the properties and obtained nominal ownership of the homes. According to CC-1, both the defendants CHRISTOPHER SCOTT and CHRISTOHER SCOTT, JR. attended each closing. In connection with the closing for 307 Beach, on approximately May 30, 2008, Wells Fargo disbursed approximately $413,068.38 in loan proceeds to an escrow account maintained at HSBC Bank N.A. by Wells Fargo's attorney ("Attorney Escrow Account"). In connection with the closing for 305 Beach, on approximately June 6, 2008, National City Bank, which was later purchased by PNC, disbursed approximately $439,972.05 in loan proceeds to the Attorney Escrow Account. Based on my training and experience, I believe that Wells Fargo and National City Bank disbursed these loan proceeds in reliance on the veracity of the statements in the relevant URLA/1003.

28. The defendant CHRISTOPHER SCOTT, JR. received funds from at least one of these closings. For instance, I have reviewed bank records for the Attorney Escrow Account, which reveal that on approximately June 6, 2008, the Attorney Escrow

Account wrote a check in the amount of $27,315.90 payable to Active Living, Inc. ("Active Living"), a corporation of which SCOTT, JR. was the sole stockholder, officer, and employee. This check includes a notation that includes CC-1's last name. On approximately June 10, 2008, SCOTT, JR. endorsed and deposited this check into Active Living's account at Washington Mutual Bank ("Active Living Washington Mutual Account").

29. The defendants CHRISTOPHER SCOTT and CHRISTOPHER SCOTT, JR. continued to further the fraudulent scheme even after the closings of 305 and 307 Beach.

30. For instance, I have reviewed the records for the Active Living Washington Mutual Account. These records reveal that on approximately September 13, 2008 and October 8, 2008, the defendant CHRISTOPHER SCOTT, JR. signed two checks— each in the amount of $3,117.40— payable to Wells Fargo Home Mortgage in partial satisfaction of the loan secured by 307 Beach. I have also reviewed bank records from Bank of America for an account held in the name of Hands On. As noted above, SCOTT was the sole shareholder, officer, and employee of Hands On. These records reveal that on approximately November 10, 2008, Hands On wrote a check payable to Wells Fargo Home Mortgage in the amount of $3,172 in partial satisfaction of the loan secured by 307 Beach.

31. The defendant CHRISTOPHER SCOTT, JR. also made three payments in partial satisfaction of the loan secured by 305 Beach. Records for the Active Living Washington Mutual Account reveal that on approximately August 14, 2008, SCOTT, JR. signed a check in the amount of $3,733.69 from the Active Living Washington Mutual Account payable to National City Mortgage Co. On approximately September 13, 2008 and

November 1, 2008, SCOTT, JR. signed two checks—each in the amount of $3,3733.03—from the Active Living Washington Mutual Account payable to National City Mortgage Co.

32. In addition to making payments on the mortgage loans secured by 307 Beach and 305 Beach, the defendants CHRISTOPHER SCOTT and CHRISTOPHER SCOTT, JR. also continued their involvement in the fraudulent scheme by paying CC-1 for his/her role as the nominal purchaser of these two properties. According to CC-1, subsequent to the closings for the two properties, SCOTT and SCOTT, JR. met CC-1 in the parking lot of a public library on Long Island. SCOTT left his vehicle and got into CC-1's, where he gave CC-1 almost $10,000 in cash.

B. 309 Beach

33. As mentioned above, CC-2 closed on 309 Beach at the meeting on Long Island attended by the defendant NIMBOKO MILLER. In connection with the closing for 309 Beach, on approximately June 13, 2008, Wells Fargo disbursed approximately $410,854.97 in loan proceeds to the Attorney Escrow Account.

34. Like the defendants CHRISTOPHER SCOTT and CHRISTOPHER SCOTT, JR., the defendant NIMBOKO MILLER furthered the illicit conspiracy after the closing by making a payment on the mortgage loan secured by 309 Beach.

35. Records from the New York State Department of State, Division of Corporations show that Bigg Silver, Inc. ("Bigg Silver") was incorporated on February 25, 2005. A review of a public records database reveals that the defendant NIMBOKO MILLER is identified as the president of Bigg Silver. In addition, an Internet search for Bigg Silver indicates that MILLER is its president.

36.     I have reviewed both the Wells Fargo loan file and bank records from Washington Mutual Bank, which reveal that the defendant NIMBOKO MILLER made one payment from Bigg Silver in partial satisfaction of the loan secured by 309 Beach. On October 27, 2008, MILLER wrote a check from Bigg Silver's account at Washington Mutual payable to "Wells Fargo Home Mortgage" in the amount of $2,784.14. MILLER wrote on the check, among other things, "[CC-2]'s Mortgage."

37.     As described above, the defendant NIMBOKO MILLER agreed to pay CC-2 an amount between $5,000 and $10,000 for CC-2 acting as the nominal purchaser for 309 Beach. Aside from certain limited payments made by renters of 309 Beach, MILLER never paid the amount due to CC-2.

V.      The Foreclosures

38.     Despite agreeing to purchase the properties back from CC-1 and CC-2, the defendants CHRISTOPHER SCOTT, CHRISTOPHER SCOTT, JR. and NIMBOKO MILLER failed to do so. The defendants also stopped making payments on the mortgage loans underlying the properties, causing them to enter foreclosure. And because the loans issued by the banks were inflated, in part, because of the false statements included in CC-1's and CC-2's mortgage applications, the banks and/or the GSE that purchased two of these properties have suffered economic harm. Although the extent of the harm caused by this scheme is presently unknown, as of October 19, 2015, the banks and/or the GSE expect to suffer a total loss of over $245,000.

A.      305 and 307 Beach

39.     Because the defendants CHRISTOPHER SCOTT and CHRISTOPHER SCOTT, JR. and CC-1 did not continue to make payments on the mortgage loans secured by

13

307 Beach or 305 Beach, the properties entered foreclosure. On or about December 15, 2014, PNC foreclosed on 305 Beach and sold it to another entity for $163,000, leaving an unpaid principal balance of at least $250,000.

40. On or about July 14, 2008, Wells Fargo sold the mortgage loan underlying 307 Beach to the Federal Home Loan Mortgage Corporation ("Freddie Mac"), a GSE. Wells Fargo initiated foreclosure proceedings on 307 Beach, which has an unpaid balance of approximately $411,814.75. Although the amount of expected loss fluctuates, as of October 19, 2015, Freddie Mac anticipates that it will suffer a loss of over $112,579 relating to this property.

B. 309 Beach

41. On or about July 14, 2008, Wells Fargo sold the mortgage loan underlying 309 Beach to Freddie Mac. Because the defendant NIMBOKO MILLER and CC-2 did not continue to make payments on the mortgage loan secured by 309 Beach, Wells Fargo has initiated foreclosure proceedings on this property. On or about June 14, 2013, 309 Beach was sold to another entity for $5,000, leaving an unpaid principal balance of approximately $413,250.00. As of October 19, 2015, Freddie Mac anticipates that it will suffer a loss of over $136,490 relating to this property.

CONCLUSION

42. Based on all of the foregoing information, I conclude that there is probable cause to believe that CHRISTOPHER SCOTT, CHRISTOPHER SCOTT, JR., also known as "C.J. Scott" and NIMBOKO MILLER, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to commit bank fraud, contrary to

14

Title 18, United States Code, Section 1344, in violation of Title 18, United States Code, Section 1349.

WHEREFORE, your deponent respectfully prays that the defendants CHRISTOPHER SCOTT, CHRISTOPHER SCOTT JR., also known as "C.J. Scott" and NIMBOKO MILLER be dealt with according to law and that warrants be issued for their arrest. Furthermore, I respectfully request that this affidavit and any arrest warrants be filed under seal.

JOSEPH DELLA PENNA
Special Agent
Federal Housing Finance Authority
Office of the Inspector General

Sworn to before me this
21st day of October, 2015

THE HONORABLE RAMON E. REYES, JR.
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK