

**U.S. Department of Justice**

*Acting United States Attorney*
*Eastern District of New York*

---

SSS:ABK/NDB/HDM         *271 Cadman Plaza East*
F.# 2014R01855              *Brooklyn, New York 11201*

March 27, 2017

By ECF

The Honorable Dora L. Irizarry
Chief United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. Christopher Scott, et al.
Criminal Docket No. 16-034 (DLI)

Dear Chief Judge Irizarry:

       The government respectfully submits this letter in advance of trial in the above-referenced case, which is scheduled to begin on July 10, 2017. The Indictment charges the defendants, Christopher Scott ("Scott Sr."), Christopher Scott, Jr. ("Scott Jr.") (together, the "Scotts") and Nimboko Miller ("Miller"), with participating in a fraudulent scheme involving three properties in Far Rockaway, Queens. Specifically, the defendants recruited individuals to act as straw buyers and had them make false statements in mortgage-loan applications to purchase the properties.

       The government writes to disclose information pursuant to Giglio v. United States, 405 U.S. 150 (1972), concerning the two straw buyers,[1] and moves to preclude cross-examination regarding this information. The government also moves in limine to admit (i) Miller's text messages with a straw buyer concerning the fraudulent scheme to purchase 309 Beach 88th Street ("309 Beach") and (ii) evidence of the Scotts' fraudulent purchase of an uncharged property transaction. For the reasons discussed below, the government's motion should be granted.

A.       Background of the Fraudulent Scheme

       The Indictment charges the defendants with participating in the fraudulent purchase of three properties in Far Rockaway, Queens: 305, 307 and 309 Beach 88th Street

---

[1]       The government does not concede the relevance, materiality or admissibility of this information.

("305 Beach," "307 Beach," and "309 Beach," respectively), all located on the same block.[2] The government alleges that the defendants recruited nominal purchasers, or "straw buyers," used the straw buyers' information to purchase the properties, and had the straw buyers make false statements in mortgage-loan applications. The Scotts recruited straw buyer ("CC-1") to purchase 305 and 307 Beach, and Miller recruited a second straw buyer, CC-2, to purchase 309 Beach.[3] The straw buyers were not intended to be the beneficial owners of the properties.

1. 305 & 307 Beach 88th Street

In approximately 2006, Scott Sr. approached CC-1 and asked that CC-1 purchase 305 and 307 Beach on Scott Sr.'s behalf because he had poor credit. Scott Sr. was to pay the mortgage, and, approximately six months after the closings, buy the properties back and ensure that they were transferred into the name of Scott Jr. or one of his businesses. In exchange for CC-1's agreement to serve as the straw buyer, Scott Sr. agreed to pay CC-1 $10,000.

In approximately May 2008, Scott Sr. presented CC-1 with, among other things, a Uniform Residential Loan Application ("Loan Application") for 307 Beach. Scott Sr. did the same for 305 Beach in approximately June 2008. Scott Sr. instructed CC-1 to sign the Loan Applications and supporting paperwork, which CC-1 did. The Loan Applications for 307 and 305 Beach contained multiple false statements. For example, the Loan Applications falsely stated that CC-1 had been employed by a real estate company for more than five years and had been in that line of work for approximately eight years. In actuality, CC-1 was retired, had never worked for the real estate company and had never worked in the real estate industry. The Loan Applications for the two properties also overstated CC-1's bank account balances at Citibank and attached forged statements reflecting balances inflated by more than $70,000.

After signing the Loan Applications and other paperwork for 305 and 307 Beach, CC-1 closed on the properties and obtained nominal ownership of the houses. On the day of the 305 Beach closing, the closing attorney's escrow account issued a check for $27,315.90 payable to Active Living, Inc. ("Active Living"). The check listed CC-1's name in the notes section. Active Living is a corporation incorporated and operated by Scott Jr. Four days later, Scott Jr. endorsed and deposited this check into Active Living's bank account. With the closings complete, the Scotts paid CC-1 approximately $10,000 in cash for serving as a straw buyer.

---

[2]     Some mortgage paperwork erroneously referred to 305 Beach 88th Street as 305 Beach 89th Street.

[3]     The Indictment refers to CC-1 as "John Doe #1" and to CC-2 as "John Doe #2," although both are women.

2. 309 Beach 88th Street

Miller accomplished nearly an identical scheme with respect to 309 Beach. In 2008, Miller met with CC-2, who agreed to serve as a straw buyer. Like the Scotts, Miller agreed to pay CC-2 an amount between $5,000 and $10,000 to use her information to purchase 309 Beach. Miller agreed that he would buy back 309 Beach from CC-2 a few months after the closing. Miller provided CC-2 with the Loan Application for 309 Beach. And like the Scotts, Miller's Loan Application contained the same type of false statements, including those about CC-2's employment and bank account balance.

Specifically, the 309 Beach Loan Application falsely stated that CC-2 was employed as a "Sales Supervisor" for a company identified as "Hands On Builders and Ren." In actuality, CC-2 had never worked for, or ever heard of, this company. The 309 Beach loan file indicates that on approximately June 11, 2008, a bank employee spoke with someone identified as "Christopher Scott," who stated that CC-2 had been a "Sales Supervisor" at "Hands on Builders and Ren" since approximately May 2005. The loan file also includes fictitious payroll and W-2 forms indicating that CC-2 worked at Hands On Builders and Renovators, Inc.

Ultimately, Scott Sr. and Miller did not buy back the properties or transfer the properties into their names. The banks foreclosed on all three properties, 305, 307 and 309 Beach, leaving hundreds of thousands of dollars in unpaid principal and ruining the credit of both CC-1 and CC-2.

B.   Disclosures Pursuant to Giglio v. United States

The government hereby discloses that in approximately 2005, CC-1's co-worker filed a complaint against her and other employees, when CC-1 worked at the Rikers Island Correctional Facility. The complaint alleged discrimination against the co-worker because he was Muslim. CC-1 was not disciplined or otherwise penalized by the New York City Department of Corrections in connection with this unsubstantiated allegation.

The government further discloses that CC-2 has been arrested twice: once, in approximately 1987, for possession of cocaine and once, in approximately 1997, for domestic assault. Neither arrest resulted in a criminal conviction. The drug possession charge involved a personal-use quantity of cocaine and occurred when CC-2 was nineteen. The arrest arose from a traffic stop of a car that CC-2 was in, along with her brother and her brother's friend. When pulled over, the brother's friend hid cocaine under the car seat and, when it was discovered, all three passengers were arrested and charged with possession of narcotics. CC-2 reported that the case was adjudicated through a diversion program, which the government confirmed. The domestic assault arrest occurred approximately ten years later and arose from a physical altercation between CC-2 and her then-boyfriend. According to CC-2, during the altercation, CC-2's boyfriend beat her, and CC-2 defended herself with a

knife, resulting in an injury to her boyfriend.  CC-2's boyfriend declined to press charges and the case was dismissed.

In addition, as a teenager, CC-2 used marijuana on occasion.

C.      **The Court Should Preclude Cross-Examination on the**
        **Giglio Information Because it is Irrelevant and Highly Prejudicial**

The government respectfully moves in limine to preclude the defendants from cross-examining CC-1 and CC-2 about the foregoing information.

1.      Courts Should Preclude Cross-Examination on Information that Does Not
        Affect the Witnesses' Character for Truthfulness and is Prejudicial and Confusing

It is well settled that the scope and extent of cross-examination is within the sound discretion of the district court.  United States v. Wilkerson, 361 F.3d 717, 734 (2d Cir. 2004); United States v. Maldonado-Rivera, 922 F.2d 934, 956 (2d Cir. 1990).  "The decision to restrict cross-examination will not be reversed absent an abuse of discretion."  United States v. Lawes, 292 F.3d 123, 131 (2d Cir. 2002) (quoting United States v. Rosa, 11 F.3d 315, 335 (2d Cir. 1993)).  Indeed, the Second Circuit has repeatedly upheld district courts' exercise of discretion in imposing reasonable limits on the subjects that may be inquired into on cross-examination.  See Rosa, 11 F.3d at 336 (district court properly precluded cross-examination on alleged rape and burglary by witness because conduct did not bear directly on the witness' credibility and because the allegations were unsubstantiated).

Where a party seeks to elicit testimony to attack a witness' character for truthfulness, its admission is governed by Federal Rule of Evidence 608(b).  See United States v. Peterson, 808 F.2d 969, 973-74 (2d Cir. 1987); United States v. Cruz, 894 F.2d 41, 43 (2d Cir. 1990).  Rule 608(b) provides, in pertinent part, that courts "may, on cross-examination, allow [specific instances of a witness' conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness."  Thus, Rule 608 permits cross-examination concerning specific instances of conduct only, if at all, to the extent that the conduct in question is "probative of truthfulness or untruthfulness."  United States v. Flaharty, 295 F.3d 182, 191-92 (2d Cir. 2002).

Admission of testimony under Rule 608(b) is limited by Federal Rule of Evidence 402, which excludes irrelevant evidence, and Rule 403, which excludes otherwise relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  United States v. Figueroa, 548 F.3d 222, 229 (2d Cir. 1992) (quoting Fed. R. Evid. 403).  Thus, when considering the admission under Rule 608(b) of specific instances of conduct that may be probative of truthfulness, the Court must balance the probative nature of the conduct against the Rule 403 factors.  See United States v. Brown, No. 07-CR-874 (KAM), 2009 WL 497606, at *4 (E.D.N.Y. Feb. 26, 2009).

Likewise, Federal Rule of Evidence 611 requires district courts to exercise "reasonable control" over the mode of interrogating witnesses so as to "avoid wasting time" and to "protect witnesses from harassment or undue embarrassment."  Fed. R. Evid. 611(a). Thus, when considering the admission under Rule 608(b) of specific instances of conduct that the Court finds probative of truthfulness, the Court must balance the probative nature of the conduct against the Rule 403 and Rule 611 factors.  Brown, 2009 WL 497606, at *4. Moreover, pursuant to Rule 608(b), extrinsic evidence of a witness' prior conduct may not be admitted to attack her truthfulness.  Peterson, 808 F.2d at 973-74; Brown, 2009 WL 497606, at *3.

2.  The Court Should Preclude Cross-Examination of the Giglio Information Here Because it is Not Relevant or Probative of Truthfulness and is Unfairly Prejudicial

The Court should preclude cross-examination about CC-1's prior job-related unsubstantiated allegation and CC-2's prior arrests and marijuana use because such matters are entirely irrelevant to the issues before the jury and are not probative of the witnesses' character for truthfulness or untruthfulness.  In addition, the information is inflammatory and risks confusing the jury with matters that are unrelated and occurred well over a decade ago.

Courts in the Second Circuit have routinely precluded cross-examination about unrelated allegations or complaints where the conduct did not involve the witness' credibility.  For example, in United States v. Horsford, the Second Circuit affirmed a district court's preclusion of cross-examination of a police sergeant about an unrelated Civilian Complaint Review Board ("CCRB") matter because the "underlying conduct" in that case— specifically, ordering a strip search and failing to report the search as required—"involved no dishonesty" and "[t]herefore, the report could not have been probative of [the officer's] truthfulness or untruthfulness."  See 422 F. App'x 29, 30 (2d Cir. 2011) (summary order) (citing United States v. Rabinowitz, 578 F.2d 910, 912 (2d Cir. 1978) (precluding cross-examination concerning witness' unlawful sex acts)); see also United States v. Barret, No. 10-CR-809 (KAM), 2012 WL 194992, at *2 (E.D.N.Y. Jan. 23, 2012) (precluding cross-examination of an officer about substantiated CCRB charges where those "prior substantiated complaints d[id] not involve conduct that bears on credibility"); United States v. Stone, No. 05-CR-401 (ILG), 2007 WL 4410054, at *1 (E.D.N.Y. Dec. 14, 2007) (noting that "[i]f all that can be said about behavior is that it might be called improper, immoral, or unlawful . . . asking about it cannot be justified under Fed. R. Evid. 608").

Courts also routinely preclude cross-examination about unrelated arrests for crimes that are not probative of truthfulness.  For example, in United States v. Fama, the Court found that "[a]lleged prior acts of domestic violence" by a cooperating co-defendant were "not probative of truthfulness" and precluded cross-examination concerning those prior bad acts.  No. 12-CR-186 (WFK), 2012 WL 6094135, at *2 (E.D.N.Y. Dec. 7, 2012).  In so holding, the Court noted that "[e]ven if these acts were shown to be relevant to [the witness'] testimony, the court would still find them to be inadmissible under Rule 403."  Id.  Similarly, the Court in Brown precluded cross-examination about an unrelated shooting and domestic

5

assault, explaining that "[a]ssaults and murders do not directly reveal truthfulness in the way that forgery, perjury, or fraud would."  2009 WL 497606, at *3; see also Flaharty, 295 F.3d at 191 (affirming the district court's "determin[ation] that [a] murder was not relevant to [a witness'] credibility," and noting that "[m]urder generally is not a crime of dishonesty, and nothing about the . . . murder suggested that it would in any way reflect on [the witness'] truthfulness").

Here, the Court should preclude cross-examination of CC-1 concerning the allegation of prejudice referenced above.  This unproven allegation from approximately twelve years ago is neither relevant to this mortgage fraud case nor probative of CC-1's character for truthfulness or untruthfulness.  Fed. R. Crim. P. 401, 608(b); see McKoy v. North Carolina, 494 U.S. 433, 440 (1990) (relevant evidence has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").  Whether a co-worker alleged that twelve years ago, CC-1 was prejudiced against him because of his religion has no bearing on CC-1's truthfulness as a witness here.

Moreover, any potential limited probative value would be substantially outweighed by unfair prejudice that would attach to the inflammatory and unproven accusation of prejudice or bias against Muslims.  Fed. R. Evid. 403.  Because this bias allegation is entirely unrelated to this case, and because CC-1 was never disciplined or otherwise penalized by her employer, testimony regarding this allegation would confuse and mislead the jury.  Id.  Accordingly, the Court should preclude cross-examination regarding this unsubstantiated and unrelated work-related bias complaint against CC-1.  See United States v. Nelson, No. 10-CR-414, 2011 WL 2207584 (PKC), at *7 (S.D.N.Y. June 3, 2011) (precluding cross-examination of a police officer who was found by the CCRB to have used "racial language" when dispersing a crowd in an incident unrelated to the subject matter of his testimony).

The Court should also preclude cross-examination regarding CC-2's prior domestic violence and drug arrests and prior marijuana use because none of it is probative of her character for truthfulness.

For example, courts have held that prior domestic violence acts are not relevant or probative of a witness' credibility.  See United States v. Jeffers, 402 F. App'x 601, 603 (2d Cir. 2010) (summary order) (affirming "the district court's determination that the purported acts of [domestic] violence were not probative of [the government witness'] credibility" and explaining that "even if the alleged abuse was somehow relevant to [the witness'] motivation for testifying [against the defendant, his ex-girlfriend], . . . the district court did not abuse its discretion in concluding that any probative value was substantially outweighed by unfair prejudice and the need for a mini-trial on domestic disputes"); Fama, 2012 WL 6094135, at *2 (noting that, even if the alleged prior acts of domestic violence "were shown to be relevant to [the witness'] testimony, the Court would still find them to be inadmissible under Rule 403").

Similarly, CC-2's prior drug arrest for a personal quantity of cocaine, and her limited marijuana use more than 30 years ago, has little or no impact on CC-2's truthfulness in this mortgage-fraud scheme, particularly in light of the time that has passed since this conduct.  In analyzing whether, under Federal Rule of Evidence 609, a defendant could be cross-examined about a prior felony conviction for selling narcotics, Judge Kiyo A. Matsumoto noted that, particularly as compared with narcotics smuggling or a distribution conspiracy, "drug possession 'has little bearing on the veracity of [defendant] as a witness and thus, ranks fairly low on the impeachment value scale.'"  United States v. Vasquez, 840 F. Supp. 2d 564, 568-69 (E.D.N.Y. 2011) (quoting United States v. Brown, 606 F. Supp. 2d 306, 319 (E.D.N.Y. 2009)).  Here, CC-2's drug possession arrest happened 30 years ago and has no bearing on her credibility as a trial witness involving the fraudulent purchase of real estate.  Similarly, CC-2's decades-old use of marijuana as a teenager does not bear on her credibility.  Accordingly, the Court should preclude cross-examination regarding CC-2's prior arrests and marijuana use.

D.    The Court Should Admit Miller's Text Messages Concerning the Fraudulent Purchase of 309 Beach as Party Admissions and Direct Evidence of the Charged Conduct

The government moves in limine to admit Miller's text messages with CC-2 concerning the fraudulent scheme to purchase 309 Beach.[4]  Between 2011 and 2012, Miller and CC-2 communicated via text message concerning their fraudulent purchase of 309 Beach.  For example, Miller texted CC-2 photos of 309 Beach and told CC-2 that he would fulfill his "promises" to buy back 309 Beach from CC-2.  (Ex. A at 2, 10.)  In subsequent text messages in 2013, Miller and CC-2 communicated about the federal investigation that led to the instant charges.  In those text messages, CC-2 provided Miller with the name and contact information for an agent that visited her, and Miller asked about the nature of the investigation, inquired about who had visited her and told her that the agent was trying to "entrap" CC-2.  (Id. at 27-30.)

The Court should admit Miller's text messages to CC-2 regarding the fraudulent scheme involving 309 Beach because they are admissible as admissions.  See Fed. R. Evid. 801(d)(2).  It is well-settled law that "[s]tatements by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them

---

[4]    The government has attached a copy of the text messages as Exhibit A.  The government has proposed redactions to text messages that do not concern 309 Beach and that the government does not seek to introduce into evidence in its case-in-chief at trial.  To be clear, the text messages that the government presently seeks to introduce are not the text messages that were the subject of prior motion practice, and which the Court addressed at the November 29, 2016 oral argument.  The text messages that were addressed on November 29, 2016, concern a property that is not part of the charged conspiracy, and those text messages evidence Miller's use of CC-2's identity to purchase a property without CC-2's prior knowledge or consent.  (Tr. of Nov. 29, 2017 Oral Argument, at 25:11-30:10.)

because they are admissions of an adverse party." See United States v. Russo, 302 F. 3d 37, 43 (2d Cir. 2002); accord United States v. Black, No. 13-CR-316 (DLI), 2014 WL 5783067, at *1 (E.D.N.Y. Nov. 5, 2014). A statement is not hearsay if it is "offered against an opposing party and . . . was made by the party." Fed. R. Evid. 801(d)(2)(A); Black, 2014 WL 5783067, at *1 ("[a] party's own statement, if offered against him, is not hearsay"). "Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule." Fed. R. Evid. 801 advisory committee notes (citations omitted). "A party's own statement is the classic example of an admission." Id.

Here, Miller's text messages to CC-2 concerning 309 Beach are party admissions that are relevant and probative of the charged fraudulent conduct involving 309 Beach. The text messages between Miller and CC-2 concerning 309 Beach are, among other things, direct evidence of (i) Miller's awareness of, and involvement with, that property; (ii) his statements to CC-2 regarding the property, including his promise to buy back the property, as he had represented to CC-2 when Miller initially recruited CC-2 into the illegal scheme; and (iii) his response to CC-2 after learning that law enforcement authorities were investigating the charged transaction. This is all highly relevant evidence and directly probative of the crimes with which Miller is charged. They are also party admissions of Miller because the government will establish that they are Miller's own statements made to CC-2.

In the alternative, the government seeks to introduce the text messages between Miller and CC-2 under Federal Rule of Evidence 404(b) as evidence of knowledge, plan, absence of mistake and consciousness of guilt. In United States v. Bayfield, a recent mortgage fraud case in this district, the Court found that a defendant's attempted transfer of the deed for a charged property from a straw buyer to himself five years after the charged fraud occurred was admissible under Rule 404(b) in that it "is relevant to show that [the defendant] was aware of—and potentially involved in—the allegedly fraudulent . . . transfer of the property. It is probative of whether [the defendant] knew that the transaction was a sham and understood that . . . [the straw buyer] did not intend to live at the property following its transfer[.]" No. 13-CR-356 (ENV), Memorandum and Order, dated Dec. 18, 2016, ECF No. 287, at 8 (E.D.N.Y. Dec. 18, 2016) (attached as Exhibit B).

Similarly, here, text messages between Miller and CC-2 demonstrate, inter alia, that Miller (i) knew and understood that CC-2 did not intend to live at 309 Beach, or otherwise control that property; (ii) planned to use CC-2 to illegally obtain proceeds from the sale of 309 Beach; (iii) did not mistakenly become involved in the 309 Beach property transaction; and (iv) was conscious of the illegal nature of the transaction, as evidenced by his response to law enforcement authorities meeting with CC-2. Moreover, nothing about the text messages is unfairly prejudicial, particularly because the government does not intend to offer in its case-in-chief evidence that Miller misused CC-2's identity to purchase a

property that is unrelated to the present charges.  Accordingly, the Court should permit the government to introduce text messages between Miller and CC-2 that relate to 309 Beach.

E.    Motion to Admit Evidence of Other Acts Against the Scotts

Pursuant to Rule 404(b)(2)(A), the government hereby (i) provides notice to the Court and the defendants of its intention to offer evidence of other acts in its case-in-chief at trial and (ii) moves in limine to admit such evidence, discussed below.

1. Second Circuit Law Allows Evidence of
   Uncharged Acts under Federal Rule of Evidence 404(b)

Courts admit evidence of a defendant's other criminal acts under Rule 404(b) if the evidence is relevant to an issue at trial other than the defendant's character — such as proving motive, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident, see Fed. R. Evid. 404(b)(2) — and if its probative value is not substantially outweighed by the risk of unfair prejudice.  See United States v. Williams, 205 F.3d 23, 33 (2d Cir. 2000).  As the Supreme Court has recognized, "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."  Huddleston v. United States, 485 U.S. 681, 685 (1988).

"Courts in this Circuit follow an 'inclusionary rule' that 'allows the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of [Rule 403]."  Black, 2014 WL 5783067, at *5 (quoting United States v. Greer, 631 F.3d 608, 614 (2d Cir. 2011) (alteration in original)).  Furthermore, "where the evidence at issue does not 'involve conduct more inflammatory than the charged crime[s],' the court should not exclude it on grounds of unfair prejudice."  Id. at 5 (quoting United States v. Paulino, 445 F.3d 211, 223 (2d Cir. 2006)).

2. The Scotts' Uncharged Acts are Admissible Under Rule 404(b)

The government seeks to introduce evidence that, in approximately 2010, the Scotts participated in the fraudulent purchase of a property located at 215A Lexington Avenue in Brooklyn, New York ("215A Lexington").  Specifically, the government intends to introduce testimony and documents demonstrating that the Scotts fraudulently purchased 215A Lexington in a substantially similar manner as the fraudulent purchase of the charged properties: that is, by using a straw buyer recruited by Scott Sr. and then funneling proceeds of the sale through Scott Jr. and a business entity under his control, which in turn paid the straw buyer $10,000 for participating in the scheme.  As with CC-1 and CC-2, the straw buyer of 215A Lexington was never intended to be the beneficial owner of that property.

This evidence is admissible under Rule 404(b) as evidence of the defendants' intent, plan, knowledge and absence of mistake.

The Second Circuit has routinely upheld the admission of "subsequent acts" evidence under Rule 404(b) when such subsequent actions "closely paralleled the charged conduct" such that "it was probative regardless of the temporal difference." United States v. Curley, 639 F.3d 50, 61 (2d Cir. 2011) (internal citations omitted) (collecting cases). In United States v. Meszaros, the defendant was charged with participating in two separate schemes to defraud separate groups of investors, one that occurred from 1999 to 2001 and a second scheme that dated from 2003 to 2007. No. 06-CR-0290 (JFB), 2008 WL 5113425, *1 (E.D.N.Y. Nov. 25, 2008). In holding that the two frauds could be charged together, and that joinder was proper, the Court noted that, "there is absolutely no prejudice to [the defendant] in this case because, even if the counts were severed for trial, evidence regarding each scheme would be admissible at a separate trial for the other scheme under Rule 404(b) . . . to show, among other things, intent, knowledge, and the absence of mistake." Id. at *9.

Similarly, in United States v. Rutkoske, the court analyzed whether the government could introduce evidence of the defendant's subsequent scheme "to combat the possible claim by [d]efendant that he was an 'innocent participant' because he did not possess knowledge of the corrupt nature of the scheme alleged in the indictment." No. 03-CR-1452, 2005 WL 3358596, at *2 (S.D.N.Y. Dec. 8, 2005). The court in Rutkoske permitted the government to introduce the subsequent scheme under Rule 404(b), citing the Second Circuit's "inclusionary rule" and finding that the defendant's subsequent acts were "sufficiently similar" to the charged scheme, showed that the defendant was "conversant in the language of stock manipulation" and was not mistaken when he committed the charged scheme. Id.; aff'd United States v. Rutkoske, 506 F.3d 170, 178 (2d Cir. 2007) (explaining that "[i]n light of the similarity between the . . . schemes, the District Court did not exceed its discretion . . . notwithstanding the fact that [the second scheme] took place four years after the charged conspiracy."). As the Second Circuit has explained, "[w]hen knowledge and intent are disputed, a defendant's commission of similar bad acts is generally deemed probative. . . . While the charged and uncharged acts must be closely parallel for the probative value of the latter on the issue of knowledge to outweigh any unfair prejudice, absolute synonymity is not required." United States v. Mingo, 76 F. App'x 379, 382 (2d Cir. 2003) (summary order).

Here, the Scotts participated in a strikingly similar mortgage fraud scheme with respect to both 305 and 307 Beach, as well as the subsequent scheme involving 215A Lexington. In all three instances, one of the Scotts recruited the straw buyer for the property, promised payment to the straw buyer in amounts ranging from $5,000 to $10,000 per property, and subsequently made related payments through one of Scott Jr.'s business entities. The Court should permit the government to introduce evidence of the 215A Lexington transaction to show the Scotts' intent, plan, knowledge and absence of mistake. The government anticipates that these issues will be central at trial. See, e.g., Scott Jr. Memorandum of Law, ECF No. 38, at 11 ("Mr. Scott, Jr. will seek to introduce evidence that

he was unaware of any fraudulent activity."). Because the two mortgage fraud schemes are "closely parallel," and because the 215A Lexington scheme is not "more inflammatory" than the charged conduct, the probative value of this Rule 404(b) evidence outweighs any danger of unfair prejudice that it could cause to the defendants. Accordingly, the Court should permit the government to introduce, pursuant to Rule 404(b), evidence concerning the 215A Lexington transaction.

F.      Conclusion

      For the foregoing reasons, the government's motions should be granted.

      Respectfully submitted,

      BRIDGET M. ROHDE
      Acting United States Attorney

By:   /s/ Ameet B. Kabrawala
      Ameet B. Kabrawala
      Nomi D. Berenson
      Hiral D. Mehta
      Assistant U.S. Attorneys
      (718) 254-7000

cc:   All Counsel (by ECF)